IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

RICHARD GENE WASHINGTON,

Plaintiff,

vs.

DR. PETER EDWARDS, M.D.,

Defendant.

CV 14-00052-H-DLC-JTJ

ORDER AND FINDINGS AND
RECOMMENDATIONS OF UNITED
STATES MAGISTRATE JUDGE

Plaintiff, Richard Washington, a state prisoner proceeding pro se and in forma pauperis, filed this civil rights action pursuant to 42 U.S.C. § 1983, alleging a denial of mental health care while incarcerated at the Montana State Prison (MSP). Currently pending is Defendant's Motion for Summary Judgment (Doc. 36) and Mr. Washington's Motion for Extension of Time (Doc. 44).

The motion for extension of time will be denied, and the motion for summary judgment should be granted and this case should be dismissed.

## I. STANDARD

A party is entitled to summary judgment if they can demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). That is, where the documentary evidence permits only one conclusion. *Anderson v. Liberty Lobby,*

1

*Inc.*, 477 U.S. 242, 251 (1986).

The party seeking summary judgment bears the initial burden of informing the Court of the basis of its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, it believes demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Where the moving party has met its initial burden with a properly supported motion, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. The non-moving party may do this by use of affidavits (including his own), depositions, answers to interrogatories, and admissions. *Id*. Only disputes over facts that might affect the outcome of the suit under the governing law are "material" and will properly preclude entry of summary judgment. *Id*.

At the summary judgment stage, the judge's function is not to weigh the evidence or determine the truth of the matter, but to determine whether there is a genuine issue for trial. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson,* 477 U.S. at 249-50.

The mere existence of a scintilla of evidence in support of the [non-

moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.

*Anderson*, 477 U.S. at 252.

In the context of a motion for summary judgment where a litigant is proceeding pro se, the Court has an obligation to construe pro se documents liberally and to afford the pro se litigant the benefit of any doubt. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *Baker v. McNeil Island Corrections Ctr.*, 859 F.2d 124, 127 (9th Cir. 1988).

## II. ALLEGATIONS

In his Amended Complaint, Mr. Washington alleges Dr. Edwards violated his right to medical care by not considering medication, by not allowing him an evaluation, and by ignoring previous evaluations and diagnoses from doctors in the community. He alleges that he suffers from headaches that occur when he bangs his head against concrete walls to make "the voices go away." He contends that his attention-deficit/hyperactivity disorder (ADHD) causes him to bite his tongue and cheeks and to peel skin off his nose and bottom lip. (Amended Complaint, Doc. 14 at 4-5.)

## III.  FACTS[1]

Plaintiff Richard Washington is a prisoner at MSP.  (Statement of Undisputed Facts (SUF), Doc. 37 at ¶ 1, citing Amended Complaint, Doc. 14 at 2.) Defendant Peter Edwards, M.D., was at all times pertinent hereto a psychiatrist at MSP.  (SUF, Doc. 37 at ¶ 2, citing Affidavit of Peter Edwards, M.D., Doc. 37-1 at ¶ 3.)  Mr. Washington began serving his current sentence at MSP on January 17, 2013.  (SUF, Doc. 37 at ¶ 3, citing Affidavit of Jamie Eads, MSP Mental Health Director, Doc. 37-4 at ¶ 6.)

Prior to his arrival at MSP, Mr. Washington was diagnosed with schizophrenia by Dr. James F. Myers on September 1, 2012.  (Doc. 45-3.)  Dr. Myers's report also references a history of ADHD, a history of major depressive order, and a diagnosis of chronic backpain and headaches.  *Id.*  Dr. Myers was unable to prescribe medications for Mr. Washington but referred him to Dr. David Shaefer who was on contract with the Flathead County Detention Center.  Dr. Shaefer refused to provide medications.  (MSJ Response, Doc. 45 at 5-6.)

According to Mr. Washington, Dr. Camille Wilson of RiverStone Health in

_____

[1]  Mr. Washington did not file a Statement of Disputed Facts as required by Local Rule 56.1(b).  He does address some of Defendants' Statements of Undisputed Facts in his Response Brief (Doc. 45), and where material, those discrepancies are noted herein.

Billings, Montana diagnosed him with moderate ADHD on August 17, 2011, and recommended continuing Mr. Washington's current treatment regimen of stimulant therapy, which was methyline (ritalin). (MSJ Response, Doc. 45 at 7.)[2] Upon entry into MSP, Mr. Washington was given a Level 1 Intake Mental Health Screening on January 17, 2013. (SUF, Doc. 37 at ¶ 4, citing Eads Affidavit, Doc. 37-4 at ¶ 7.) Because his Level 1 Screening was positive, Mr. Washington was given a Level 2 Mental Health Clinical Intake Assessment on January 29, 2013. (SUF, Doc. 37 at ¶ 5 citing Eads Affidavit, Doc. 37-4 at ¶ 8.) In his Level 2, Mr. Washington reported he had previously been diagnosed with schizophrenia and ADHD and his medications Ritalin and Seroquel were discontinued at the START program immediately prior to his arrival at MSP. He was referred to the MSP psychiatrist. (SUF, Doc. 37 at ¶ 6, citing Eads Affidavit, Doc. 37-4 at ¶ 9.)

Dr. Edwards indicates he saw Mr. Washington on March 12, 2013. (SUF, Doc. 37 at ¶ 7, citing Edwards Affidavit, Doc. 37-1 at ¶ 7.) Mr. Washington, however, describes the encounter as follows: Dr. Edwards asked him who he was and told him to sit down but before he could sit Dr. Edwards stated: "I see no

_____

[2] Mr. Washington attempted to subpoena Dr. Wilson's medical records but Dr. Wilson had moved and changed her name to Camile Laudicina. Mr. Wilson did attach an unauthenticated copy of a March 21, 2011 record from RiverStone Health indicating that Mr. Washington was evaluated by Dr. Wilson, a clinical psychologist, with ADHD. (Doc. 45-4 at 9.)

evidence of you having schizophrenia and I don't care how many doctors have previously diagnosed you with any disorders because our visit is over and I won't be able to help you." (MSJ Response, Doc. 45 at 3-4.)

In his March 12, 2013 note, Dr. Edwards noted Mr. Washington claimed to have schizophrenia. After reviewing Mr. Washington's records and observing him that day, however, Dr. Edwards saw no evidence from Mr. Washington's history or presentation that he had schizophrenia. (SUF, Doc. 37 at ¶ 8, citing Edwards Affidavit, Doc. 37-1 at ¶ 8.) The records Dr. Edwards reviewed included psychiatric progress notes from David Schaefer, M.D., Dr. Edwards' predecessor at MSP, who saw Mr. Washington in 2001, 2002, and 2006. Dr. Schaefer noted Mr. Washington's paranoia and depression and prescribed Prozac, Zoloft, Doxepin, and Wellbutrin. Dr. Schaefer ultimately diagnosed Mr. Washington with a personality disorder. He also noted Mr. Washington had a history of malingering and drug seeking. (SUF, Doc. 37 at ¶ 9, citing Edwards Affidavit, Doc. 37-1 at ¶ 9.)

Records from two MSWs (Masters in Social Work) at MSP who examined Mr. Washington in 2000 indicated Mr. Washington claimed paranoia but was not delusional. His thoughts were ordered, and his speech and movement were normal. (SUF, Doc. 37 at ¶ 10, citing Edwards Affidavit, Doc. 37-1 at ¶ 10.) Mr.

Washington indicates that he had panic attacks caused by paranoia, depression, and anxiety. (MSJ Response, Doc. 45 at 12.) He also contends that he informed the two MSW's at MSP in 2000 that he has poor speech at times and cannot always concentrate properly. (MSJ Response, Doc. 45 at 21.)

Dr. Edwards noted Mr. Washington arrived at MSP taking 1 mg of Risperdal, which Dr. Edwards discontinued because it was a sub-therapeutic dosage to treat schizophrenia. (SUF, Doc. 37 at ¶ 10, citing Edwards Affidavit, Doc. 37-1 at ¶ 9.) Dr. Edwards noted Mr. Washington had no positive or negative symptoms consistent with schizophrenia, and that a diagnosis of schizophrenia for a man in his 40s would be extremely rare. (SUF, Doc. 37 at ¶ 12, citing Edwards Affidavit, Doc. 37-1 at ¶10.) Although Mr. Washington reported his symptoms of schizophrenia as paranoia, panic attacks, and an inability to concentrate, he presented in a perfectly normal fashion to Dr. Edwards that day. (SUF, Doc. 37 at ¶ 13, citing Edwards Affidavit, Doc. 37-1 at ¶ 11.)

Mr. Washington's speech was regular in rate and tone, and his psychomotor activity was within normal limits. His thoughts were logical and goal directed. There was absolutely no evidence of psychosis, delusions, hallucinations, blocking, derailment, confusion, or disorganization. Mr. Washington had no cognitive deficits and no negative symptoms of schizophrenia, such as withdrawal. Nor was

Mr. Washington bizarre at all in his presentation. (SUF, Doc. 37 at ¶ 14, citing Edwards Affidavit, Doc. 37-1 at ¶ 12.) Dr. Edwards did not give Mr. Washington an Axis I diagnosis on March 12, 2013. Under Axis I, he stated in his note he suspected Washington of malingering. Under Axis II, Dr. Edwards stated he strongly suspected antisocial personality disorder. (SUF, Doc. 37 at ¶ 15, citing Edwards Affidavit, Doc. 37-1 at ¶ 13.) Dr. Edwards concluded his note of March 12, 2013, by stating Mr. Washington could be seen on a prn ("as needed") basis. (SUF, Doc. 37 at ¶ 16, citing Edwards Affidavit, Doc. 37-1 at ¶ 14.)

After that, Mr. Washington kited MSP mental health staff numerous times, stating he had been diagnosed with schizophrenia by mental health providers in the community, was experiencing symptoms of schizophrenia and ADHD, and wanted to get back on his medications.[3] (SUF, Doc. 37 at ¶ 17, citing Eads Affidavit, Doc. 37-4 at ¶ 13.) Dr. Edwards and other mental health staff responded to Mr. Washington's kites. For example, on September 3, 2013, Thomas McElderry, a mental health licensed practical nurse, responded that Dr. Edwards would not put Mr. Washington on Risperdal, but that Washington could kite his symptoms and request to be seen. (SUF, Doc. 37 at ¶ 18, citing Eads Affidavit, Doc. 37-4 at ¶ 14.)

---

[3] A "kite" is an informal offender/staff request form.

On September 11, 2013, Washington kited MSP mental health, listing his symptoms and asking to be seen. He was assessed by mental health that day, and on September 18, 2013, Dr. Edwards responded to Washington's kite stating he would have one of the mental health technicians give him information on stress management, and also that Washington could request to be screened for a group. (SUF, Doc. 37 at ¶ 19, citing Eads Affidavit, Doc. 37-4 at ¶ 15.)

In February 2014, Mr. Washington again kited MSP Mental Health, telling them he had been diagnosed with ADHD, schizophrenia, anxiety, and a social disorder in the community. He listed his symptoms and stated he needed his meds back. (SUF, Doc. 37 at ¶ 20, citing Eads Affidavit, Doc. 37-4 at ¶ 16.) Dr. Edwards responded to this kite, telling Mr. Washington to write his symptoms of anxiety. He further stated: "Persons with delusions ("secret society") usually do no[t] know this is abnormal. Thus this would not be treatable. In regards to ADHD – are you in school? By the way, there is no evidence you have schizophrenia. I do not provide meds for sleep (Ambien)." (SUF, Doc. 37 at ¶ 21, citing Eads Affidavit, Doc. 37-4 at ¶ 17.)

On March 11, 2014, Mr. Washington again kited MSP Mental Health with the same issues and requested private counseling. Dr. Edwards responded: "What are your symptoms? You may kite back. You will not have private counceling

[sic] but can talk to Todd Boese, [registered nurse,] on his weekly rounds in locked housing. You can request therapy sessions and or groups when you are out of locked housing." (SUF, Doc. 37 at ¶ 22, citing Eads Affidavit, Doc. 37-4 at ¶ 18.)

Mr. Washington kited back the following day, listing his symptoms. Dr. Edwards responded: "I do not think you are schizophrenic. Since you completed the above kite it appears your concentration is intact." (SUF, Doc. 37 at ¶ 23, citing Eads Affidavit, Doc. 37-4 at ¶ 19.)

On March 22, 2014, Mr. Washington kited MSP Mental Health again to say he disagreed with Dr. Edwards's response to his previous kite. He again stated the same issues, i.e., that he had been diagnosed with ADD/ADHD, schizophrenia, and anxiety attacks in the community, he had shown Dr. Edwards and other mental health staff documents evidencing these diagnoses, and MSP mental health has ignored and neglected him. (SUF, Doc. 37 at ¶ 24, citing Eads Affidavit, Doc. 37-4 at ¶ 20.) Jill Buck, R.N., MSP Mental Health Director at the time, responded: "Mr. Washington, it is our jobs [sic] and ethical duties [sic] to diagnose you based on the symptoms you exhibit. There is a lot of time in prison to observe and document the symptoms or lack of symptoms that drive the course of treatment for each inmate. You are monitored by the rounds provider and we will get reports from security staff as well." (SUF, Doc. 37 at ¶ 25, citing Eads Affidavit, Doc. 37-

4 at ¶ 21.)

On May 30, 2014, Mr. Washington kited MSP Mental Health, asking to know his diagnosis, if any from Dr. Edwards, and any medications, if any, prescribed to him by Dr. Edwards. (SUF, Doc. 37 at ¶ 26, citing Eads Affidavit, Doc. 37-4 at ¶ 22.) Dr. Edwards responded: "Malingering and anti-social personality disorder." (SUF, Doc. 37 at ¶ 27, citing Eads Affidavit, Doc. 37-4 at ¶ 23.)

Mr. Washington again kited MSP Mental Health on November 3, 2014, stating he needed to get back on his meds for schizophrenia and ADD/ADHD, depression, and anxiety. (SUF, Doc. 37 at ¶ 28, citing Eads Affidavit, Doc. 37-4 at ¶ 24.) Acting Mental Health Director, Robin Becker, R.N., responded that Mr. Washington was on the schedule to be seen by the mental health provider and should discuss his symptoms at that time. (SUF, Doc. 37 at ¶ 29, citing Eads Affidavit, Doc. 37-4 at ¶ 25.) Mr. Washington was seen by MSP's new psychiatrist, Christina Quijano, M.D., via telepsychiatry on December 8, 2014. (SUF, Doc. 37 at ¶ 30, citing Eads Affidavit, Doc. 37-4 at ¶ 26.) In her record of that date, Dr. Quijano notes Mr. Washington told her he has schizophrenia issues and was very focused on paperwork he had from Dr. Myers showing this diagnosis. Mr. Washington also told Dr. Quijano several times he had a past

diagnosis of ADHD and asked her for medication for it. Dr. Quijano's observations about Mr. Washington's symptoms were very similar to those of Dr. Edwards from March 2013. Dr. Quijano prescribed Risperidone (Risperdal) 1 mg for Mr. Washington's psychotic symptoms. (SUF, Doc. 37 at ¶ 31, citing Eads Affidavit, Doc. 37-4 at ¶ 27.)

By the time Mr. Washington next saw Dr. Quijano via telepsychiatry on February 9, 2015, he had stopped taking the Risperidone because he did not like it. (SUF, Doc. 37 at ¶ 32, citing Eads Affidavit, Doc. 37-4 at ¶ 28.) Mr. Washington indicates that he saw a commercial that suggested that Risperdal may cause men to grow breasts and since his breasts were suddenly becoming larger, he became paranoid, had a panic attack, and decided to discontinue the Risperdal. (MSJ Response, Doc. 45 at 14.)

Dr. Quijano noted that Mr. Washington was less focused on confirming a diagnosis of schizophrenia and instead was very focused on his bladder. He was frustrated the MSP medical staff would not prescribe Oxybutynin for his bladder and asked if Dr. Quijano would. When she refused and redirected him to his psychological symptoms, Mr. Washington became focused on his ADHD and again asked for medication for it. Dr. Quijano prescribed Prozac. (SUF, Doc. 37 at ¶ 32, citing Eads Affidavit, Doc. 37-4 at ¶ 28.)

Mr. Washington next saw Dr. Quijano on April 6, 2015. At that time, Dr. Quiano noted Mr. Washington was a very inconsistent and unreliable historian. He was initially invested in a diagnosis of schizophrenia but did not like Risperdal and stopped it. Then he was invested in a diagnosis of depression. He was started on Prozac but did not like it. Again, he claimed paranoia and hallucinations, but was vague and inconsistent in reporting them. Again, his speech was normal in rate, volume, and tone. His movements were normal. His thoughts were organized and goal directed; there were no auditory or visual hallucinations. He requested Ativan. When told Dr. Quijano could not prescribe that medication, he asked for Haldol. He was prescribed Celexa. (SUF, Doc. 37 at ¶ 33, citing Eads Affidavit, Doc. 37-4 at ¶ 29.) Mr. Washington contends that Dr. Quijano finds him inconsistent because she interrupts him every five seconds and asks about another disorder and he cannot concentrate explain his symptoms under that kind of pressure. (MSJ Response, Doc. 45 at 14.)

Mr. Washington refused his June 1, 2015 appointment with Dr. Quijano. Dr. Quijano discontinued his Celexa because he was not taking it. She reviewed partial records from community providers Mr. Washington had produced, which indicated he had been prescribed medications for sleep and ADHD. Dr. Quijano stated in her note of that day that Mr. Washington could be seen in the future for

any symptoms or additional assessment for medications.  (SUF, Doc. 37 at ¶ 34, citing Eads Affidavit, Doc. 37-4 at ¶ 30.)

When Washington saw Dr. Quijano on July 6, 2015, his reported symptoms were the same.  His mental status examination was the same.  He requested Seroquel or Ativan for anger, irritability, and depression.  He was prescribed Lithium.  (SUF, Doc. 37 at ¶ 35, citing Eads Affidavit, Doc. 37-4 at ¶ 31.)  By Mr. Washington's next consult with Dr. Quijano on August 3, 2015, he had not taken any of the lithium and refused to be seen by mental health.  (SUF, Doc. 37 at ¶ 36, citing Eads Affidavit, Doc. 37-4 at ¶ 32.)

## IV.   ANALYSIS

To state a § 1983 claim for violation of the Eighth Amendment based on inadequate medical care, a plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  Thus, to prevail, Mr. Washington must show both that his mental health needs were objectively serious, and that Dr. Edwards possessed a sufficiently culpable state of mind.  *Wilson v. Seiter*, 501 U.S. 294, 299 (1991); *McKinney v. Anderson*, 959 F.2d 853, 854 (9th Cir. 1992) (on remand).  The requisite state of mind for a medical claim is "deliberate indifference." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992).  The "deliberate indifference" standard

applies in cases involving the adequacy of mental health care in prisons. *Doty v. County of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994); *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982).

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Indications that a prisoner has a serious need for medical/mental health treatment are the following: the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. *See, e.g., Wood v. Housewright*, 900 F.2d 1332, 133741 (9th Cir. 1990) (citing cases); *Hunt v. Dental Dept.*, 865 F.2d 198, 200–01 (9th Cir. 1989); *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds, WMX Technologies v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court established a demanding standard for "deliberate indifference." Negligence is insufficient. *Farmer*, 511 U.S. at 835. Deliberate indifference is established only where the defendant subjectively "knows of and disregards an excessive risk to inmate health and safety." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (internal

15

citation omitted). Deliberate indifference can be established "by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations omitted).

A physician need not fail to treat an inmate altogether to violate that inmate's Eighth Amendment rights. *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989). A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. *Id.* However, "[a] difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not [without more] amount to deliberate of indifference." *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012), *overruled on other grounds, Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014).

At most, Mr. Washington has only shown a difference of opinion regarding a particular treatment for his mental health needs. To establish that such a difference of opinion amounted to deliberate indifference, the prisoner "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and "that they chose this course in conscious disregard of an excessive risk to [the prisoner's] health." *Jackson v. McIntosh*, 90 F.3d 330, 332

(9th Cir. 1996).  Mr. Washington does not allege a conscious disregard for his mental health treatment.

As evidenced by his affidavit (Doc. 37-1) and his psychiatric evaluation note (Doc. 37-2), Dr. Edwards made an assessment of Mr. Washington's mental health conditions.  He reviewed Mr. Washington's records from his prior time spent at MSP, he reviewed Mr. Washington's past medical, family and social history with him, and did a general mental status exam.  He diagnosed him with malingering and suspected antisocial personality disorder.  He disagreed that Mr. Washington had schizophrenia.  (Doc. 37-2.)  Whether Dr. Edwards was correct in his diagnosis is not the issue in this case.  He observed Mr. Washington, reviewed his records, and made his assessment.  The fact that he disagreed with Dr. Myers (a licensed clinical professional counselor)'s assessment does not amount to deliberate indifference.

The responses to Mr. Washington's mental health requests do not indicate a deliberate indifference to his mental health conditions.  Mr. Washington was advised that although he would not receive private counseling he could talk to a nurse during weekly rounds in the locked housing unit and he could request group therapy once he was released from the locked housing unit.  (Doc. 2-1 at 8.)  He was also advised in April 2014 by the Prison Mental Health Director that he was

being monitored by the "rounds provider" and that they get reports from security staff as well. (Doc. 2-1 at 5.) The Director indicated that it is the observation of symptoms or lack of symptoms that drives the course of treatment. (Doc. 2-1 at 5.) In May 2014, Mr. Washington was advised that Mental Health was monitoring his behavior and seeing him on weekly rounds. (Doc. 2-1 at 4.)

Although Mr. Washington may not have received the mental health treatment that he wanted, Dr. Edwards evaluated his symptoms and provided a means of monitoring his conditions. Even if this alternative course of treatment is not working, it is insufficient to allege a denial of medical care claim under the Eighth Amendment.

As set forth above, Mr. Washington alleged that he suffered from headaches caused from banging his head against concrete walls to "make the voices go away," he alleged that he suffered from biting his tongue and cheeks due to his ADHD/ADD, and that he suffered from self-mutilation. (Amended Complaint, Doc. 14 at 5.) As represented by Cindy Hiner in his Affidavit done in support of Defendants' Motion for Summary Judgment, there is no record of a single complaint of headaches caused by banging his head against concrete walls to make voices go away. There is no record of Mr. Washington complaining about biting his tongue and cheeks due to ADHD/ADD. Nor is there any record of Mr.

Washington indicating he suffered from self-mutilation. (Hiner Affidavit, Doc. 37-10.) Even when Dr. Edwards asked him to list his symptoms, Mr. Washington did not include head banging or self-mutilations. (March 12, 2014 MHR listing his symptoms as inability to concentrate, a nervous problem, anxiety, paranoia, hearing voices, Doc. 37-7 at 7.)

In addition, although Mr. Washington indicates that he had a diagnosis of schizophrenia from the community, the only evidence is the September 1, 2012 report from Dr. Myers, a licensed clinical professional counselor diagnosing Mr. Washington with schizophrenia. There is no record, however, of Mr. Washington being prescribed medications for schizophrenia. There is an indication in Dr. Edwards's records that Mr. Washington arrived at MSP taking 1 mg of Risperdal, but it is unclear who prescribed this medication or why. Dr. Edwards discontinued the Risperdal because it was a sub-therapeutic dosage to treat schizophrenia. (Edwards Affidavit, Doc. 37-1 at 4, ¶ 11.)

On his January 17, 2013 intake mental health screening form, Mr. Washington indicated that he had been prescribed Ritalin and Seroquel for his mental health problems but that those medications were discontinued at START two weeks prior. (Intake form, Doc. 37-5 at 2.) The records submitted by Defendants indicate that Mr. Washington was later prescribed Risperidone but did

not like it and discontinued it.  (Dr. Quijano's records, Doc. 37-8 at 8-11, indicating started on Risperidone on December 8, 2014, but stopped after four weeks because he did not like it.)

Even if the Court assumes that Mr. Washington has a serious mental health condition, there is a lack of a genuine issue of material fact regarding whether Dr. Edwards was deliberately indifferent to those issues.  Mr. Washington's evidence is insufficient to establish deliberate indifference on the part of Dr. Edwards.  At most, Mr. Washington has shown a difference of opinion regarding the care he received, which is insufficient to state an Eighth Amendment claim for deliberate indifference.

## V.  MOTION FOR EXTENSION

Just prior to filing his response to Defendant's motion for summary judgment, Mr. Washington filed a motion for extension of time asking for additional time to research his childhood psychiatric records from 1975 through 1979 to demonstrate that he was diagnosed with ADHD at that time and to give him an opportunity to gather his medical records from MSP between 2000 and 2006 to demonstrate that he did complain of self mutilation during that time.  (Doc. 44.)

Rule 56(d) of the Federal Rules of Civil Procedure provides:

**(d) When Facts Are Unavailable to the Nonmovant.** If a
nonmovant shows by affidavit or declaration that, for specified
reasons, it cannot present facts essential to justify its opposition, the
court may:
>    (1) defer considering the motion or deny it;
>    (2) allow time to obtain affidavits or declarations or to take
>    discovery; or
>    (3) issue any other appropriate order.

Mr. Washington, however, has not met his burden of demonstrating that he cannot

present facts essential to justify his opposition.  First, records from nearly 40 years

ago would have an minimal impact on the issue of whether Dr. Edwards was

deliberately indifferent to treating his condition in 2013 and 2014.  Even assuming

Mr. Washington had ADHD, he has not shown that Dr. Edwards was deliberately

indifferent to that condition by not providing him with the requested medications.

The Court has recognized a lack of evidence regarding the self-mutilation of

his nose and bottom lip, but again even if there was evidence of that he was

picking at the skin in his nose and bottom lip, that is insufficient to demonstrate

that Dr. Edwards was deliberately indifferent to his mental health conditions.

The motion for extension will be denied.

Based upon the foregoing, the Court issues the following:

**ORDER**

Mr. Washington's Motion for Extension (Doc. 44) is **DENIED**.

Further, the Court issues the following:

## RECOMMENDATIONS

1.  Defendant's Motion for Summary Judgment (Doc. 36) should be **GRANTED** and this matter **DISMISSED**.  The Clerk of Court should be directed to close the case and enter judgment in favor of Defendant pursuant to Rule 58 of the Federal Rules of Civil Procedure.

2.  The Clerk of Court should be directed to have the docket reflect that the Court certifies pursuant to Rule 24(a)(3)(A) of the Federal Rules of Appellate Procedure that any appeal of this decision would not be taken in good faith.  No reasonable person could suppose an appeal would have merit.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT

The parties may file objections to these Findings and Recommendations within fourteen (14) days after service (mailing) hereof.[4]  28 U.S.C. § 636.  Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

This order is not immediately appealable to the Ninth Circuit Court of

---

[4]  As this deadline allows a party to act after the Findings and Recommendations is "served," it falls under Fed.R.Civ.P. 6(d).  Therefore, three (3) days are added after the period would otherwise expire.

Appeals.  Any notice of appeal pursuant to Fed.R.App.P. 4(a),should not be filed until entry of the District Court's final judgment.

DATED this 16th day of August, 2016.

/s/ John Johnston
John Johnston
United States Magistrate Judge